Thank you, Your Honors, and may it please the Court. My name is Wen Thaw, and I represent the Appellants, Cedar Point Nursery, and Fowler Packing Company, which I'll refer to collectively as the growers. I'll watch the clock, but I'll try to reserve four minutes for rebuttal. Your Honors, the Access Regulation allows union organizers to solicit agricultural workers on the growers' property for 120 days per year for three hours per day. Because those union organizers may enter the growers' property without a warrant or the growers' consent, the Access Regulation violates the Takings Clause and the Seizure Clause. Now, with respect to the Takings Clause analysis, I believe the Supreme Court's decision in Nolan v. California Coastal Commission is instructive. In Nolan, the Supreme Court of the United States held that a proposed grant of an easement across a private property of the Nolans to third-party beachgoers would have been an unconstitutional taking of the Nolans' property. As relevant here, the Court explained that it could conduct a takings inquiry using the bright-line rule set in the physical takings cases of the Supreme Court, articulated in cases like Loretto and Nolan and Horn, rather than resorting to an ad hoc multi-factor balancing test set forth by the Supreme Court in cases like Penn Central. This was so because in Nolan, like this case, involved a perpetual easement for the benefit of a third party, and like this case, Nolan involved the easement that took away the grower's right to exclude. But a perpetual easement allowing access by members of the general public is quite different from access for the government for limited purposes for a limited time. I mean, I don't see Nolan as actually very close. Well, Your Honors, I would disagree with that, because in Nolan, the Court's opinion noted that the easement was perpetual because there was no end date in sight, even though no particular beachgoer was going to be himself or herself permanently situated on the easement. Of course. That's the nature of an easement of passage. Right.  Exactly. And, you know, in this case, the union organizers, though they're not on the grower's property 24-7, they're welcome to be on the grower's property by filing a notice of intent at any time during the year, as long as it doesn't exceed 120 days for the year. And the following year, they can start that process over again. Right. And with respect to the easement, the Board, my friend on the other side, doesn't really much dispute the fact that it's an easement, and that's for a good reason. This access regulation involves union organizers physically intruding on the grower's property. This isn't some sort of restriction on use, say, a law that requires the growers to not use GMOs or discern a way for the growers to harvest their crops. This is actually a law that requires physical presence of people that the growers would rather exclude on their private business on the union's property. And if someone can go onto your property and there's nothing you can do, you can't resort to anything in the law to stop them from being on your property, I think it's safe to assume that they have some interest on that property, in that property. With respect to Judge Fletcher's time, place, and manner comment, I think the time and manner, as we cite in footnote 3 of our reply brief, time and manner, time, place, and manner restrictions are quite common features of easements. For example, you can have an easement that allowed for a church, a parking spot in the church during church hours. And, in fact, California Code, I believe it's 801 subsection 16, allows an easement for a church seat. So I think in that circumstance, time, place, and manner restrictions are quite common features of easements. And I think any time, place, any limited duration of the easement would go to the nature of the remedy rather than change whether there has been an easement taken in the first place. I'd also like to mention something about Pruneyard, which the respondents cite quite often in their reply brief. As the Supreme Court articulated later in Nolan, and especially in Horn, Pruneyard isn't about the main distinction in Pruneyard isn't about the duration of the easement. Rather, it's about whether the place, whether the nature of the property is a place of public accommodation or not. And, you know, the Takings Inquiry focuses on State common law. And at State common law, historically, it was places like inns or taverns. These days, it's places like hotels or restaurants or shopping malls like Pruneyard. The right to exclude is just fundamentally different in places of public accommodation. But as we mentioned in our reply brief in the Allred case, places that are only open for the employer or their employees or perhaps even specified clientele are certainly not places of public accommodation and do not fall under the places of public accommodation exception. For example, to use one analogy, if the ABA wanted to solicit members, the American Bar Association wanted to solicit members at a mall, that would certainly be much different if they were allowed to go into private law firms and solicit members there. Now, we also, the growers also, as we allege in our complaint, the access regulation also violates the court's prohibition on or the Constitution's prohibition on unreasonable seizures. Now, there are two steps in the seizure inquiry. One is whether the access regulation facilitates a cognizable seizure. And second, the second step asks whether that seizure is reasonable or unreasonable. With respect to the first step, I think this case would certainly be an easy case if it were decided in the Fourth Circuit because you have the Fourth Circuit opinion of Presley v. City of Charlottesville, and I think the same logic applies here in the Ninth Circuit. In Presley, the Fourth Circuit recognized that a map which allowed third-party trespassers to enter private property was or worked in cognizable seizure. And this case is even worse in some ways because rather than the government just failing to correct the map, this case involves the intentional grant of third-party union organizers onto the growers' private property. So I think this case is consistent in every constitutionally significant way with the Fourth Circuit's analysis in Presley, which means that there is a cognizable seizure here. Now, the second step in the inquiry is whether a seizure is unreasonable. And the reasonableness balance focuses on the growers' possessory rights and the union's right in taking access on the growers' property. And I have two major points to make with respect to the reasonableness balance. One, as the district court noted in a footnote, the ‑‑ it is presumed that a warrantless ‑‑ that a warrantless invasion on property is unreasonable. So we have ‑‑ they don't come onto the grower's land with a warrant. So I think there you have your presumption of unreasonableness. And second, actually performing the balancing test, I think you have, you know, the growers, as we alleged in our complaint and also in our declaration submitted in conjunction with the preliminary injunction motion, in addition to the kind of the destruction of the growers' right to exclude, you also have things like contamination of food, interest in workers' safety, and goodwill that the growers lose by having these third-party union organizers take access on the growers' property. Now, with respect to the union's interest in taking access to the property, the growers actually have no problem with the union talking to the workers. It's where they talk to the workers that matter. And as noted in the Supreme Court's case in Lechmere, there are plenty of alternative forms of communication by which union organizers can reach these employees and inform them of the benefits and the costs of union organization. And for example, as we submitted in our complaint, all of our ‑‑ from, say, the 1920s or even the 1960s, in which most of the growers' employees live on site, this is a case in which, as we've alleged in the excerpts of record, I believe page 108 and 109, which includes our complaint, that all of the growers' employees at either Cedar Point, at both Cedar Point and Fowler, live in houses or hotels, whether they be in the Fresno area or near the Oregon border. And many of the growers' employees have cell phones or smart phones, and all of them can converse in Spanish or English. So the board's allegations about indigenous language, remember, this is an as-applied challenge. Their allegations about indigenous languages just do not apply here. And I guess one final point I would like to make, if there are no further questions, is that the growers ‑‑ this case is like Lechmere in many ways. And in Lechmere, they didn't have things like cell phones or smart phones or anything like that. But here are the growers, many of their employees, have smart phones and cell phones. They live off‑site, which is the most critical part. And the final point I would like to make to that is acts like the NLRA and the AORA, as the court said in Lechmere, is primarily focused on the employees, and the rights of non‑employee union organizers are only derivative of that right. And by the board's own evidence that they submitted into the supplemental excerpts of record, they said that the hour before work, which is when the union workers took access to Cedar Point, is particularly bad for the employees, because the employees are getting in position to work. And furthermore, many farm workers testified at those board meetings, cited in the supplemental record ‑‑ excerpts of record, I believe, at page 6 and page 21, that the ‑‑ that workers simply just do not have time before and afterwards. I just want to confirm, you're up here on an appeal from the district court's grant of a motion to dismiss under 12B6. That's correct, Judge Páez. So what we look at is what was alleged in the complaint. Yes, and we certainly do allege in the complaint that the growers' employees all live off‑site, which is the most important thing, and we allege that in the complaint at paragraph 27, I believe it was, for Cedar Point, and paragraph 37 for Fowler. And they certainly don't dispute that. And properly, all the information that was provided to the district court in connection with the motion for a preliminary injunction is really not ‑‑ I mean, unless it's alleged in the complaint, it's really not before us. Right. I mean, I think they elaborate on what we allege in the complaint, and that's the sort of evidence that we would proffer if this case were remanded and we had the opportunity to conduct discovery, submit additional declarations, and things like that. But as alleged in the complaint, I think we've alleged enough for the seizure point, certainly for the takings point, and also for the seizure point, because we allege that the workers live off‑site and things like they have alternative forms of communication in the complaint. Okay. If there are no further questions, Your Honor, I'd like to reserve my time for rebuttal. Okay. Thank you. Thank you. Thank you. May it please the Court, Matthew Weiss, Deputy Attorney General for the California Agricultural Labor Relations Board, Chair, Members, and Secretary. The growers and their counsel ask this Court to cast aside longstanding takings jurisprudence in favor of a reconception of the law that privileges private property interests over all others. For decades, the Supreme Court has measured regulatory restrictions on property, like the Board's 40‑year‑old access regulation here, under Penn Central's flexible multi‑factor balancing test. But the growers suggest that any regulation that allows access to private property, even a regulation with strict time, place, and manner limitations, is a categorical per se taking and is even a seizure of property. This Court should reject those arguments and should uphold the district court's judgment dismissing the case. First, the growers argue that a categorical per se taking occurs any time a third party accesses private property that is not open to the public. This despite the Supreme Court's recent observation in the Arkansas Game and Fish Commission case that categorical takings are rare and that most takings claims turn on situation‑specific factual inquiries. The growers' all or nothing approach of dismissing the Penn Central analysis, even in the alternative, aims to radically change takings jurisprudence, and it is wrong on the law. For decades, the Supreme Court has measured regulatory restrictions under Penn Central's three‑factor balancing test to determine the character of the government action, the economic impact of the regulation, and any interference with reasonable investment‑backed expectations. Determining whether the access regulation is constitutional calls for this approach of weighing the nature of the access granted and any effects on the value and use of the property. But the growers don't conduct this analysis. Indeed, as the district court noted, they don't even allege that the access regulation had any negative economic impact on them at all. Instead, they insist that the taking ‑‑ that the regulation is a categorical physical taking, a physical intrusion, occupation, or appropriation that is permanent and continuous. They allege, as the growers' council just said, that this is a case like Loretto or like Nolan. Loretto, of course, is the case where there was a cable TV receiver on top of an apartment building. It was stationed there permanently, continuously. As the Loretto court said, it effectively destroyed the possession, use, and disposal of the property. Nolan, I think it's worth looking at those facts. There's a public beach on one side of the property, a public beach on the other side of the property, and anyone at any time could walk right through the Nolan's front yard and, again, destroy that property. So that was, as the court in Nolan acknowledged, was a classic right-of-way easement that would have allowed the space to be continuously invaded. Here, the regulation does not allow anyone at any time to access the property. Instead, the regulation has strict time, place, and manner limitations. And those limitations ensure that any access to the property is brief, unobtrusive, and does not interfere with the business operations on the property. Does it make any difference, one way or the other, to the analysis of the purpose behind the access regulation here and the purpose and the beneficiaries of the easement in Nolan? I mean, what we have here is basically a government regulatory purpose. And in Nolan, what we have is a general-purpose easement for the benefit of the public, but it's not regulatory. I mean, we're not trying to otherwise regulate the behavior of the property owner. Whereas here, what's at issue really is labor organizing, which has significant impact or potentially significant impact on the behavior of the growers vis-à-vis their employees. Does that distinction make any difference in the case to a takings analysis? I think the question here is whether there is, you know, whether there is obtrusiveness, whether there's interference. And if the specific purpose of the regulation and that purpose of the regulation is to allow workers to go to organizers to go on to the property to meet and talk with the workers and to solicit their support. And if that purpose is carried out in a very narrow way so that it does not interfere with the growers' property interests, with their business operations, it doesn't cause them to lose any value or use of the property. I think that's the focus here. And there are time, place, and manner limitations that ensure that that occurs, that there's a very limited entrance granted for a very specific purpose. So some of those limitations include that organizers must give written notice of the intent to enter on to the property. They must identify themselves with a badge. They can't overwhelm the property with numbers. They have to have only one organizer per 15 workers. They're only allowed, you know, contrary to this notion that they can just come on to the property for 120 days in a year and three hours, you know, that's aggregating all of the terms in time. The organizers are only allowed on to the property for one-hour increments during non-work periods, before or after work, or during the lunch hour. The 30-day periods can be shortened if, well, obviously if an organizer goes on to the property and there doesn't be any sort of, you know, union that forms, then obviously they're going to leave. But specific into the regulation itself, there is a provision that states that if there's an election and the ballots have been counted, then the organizers have to leave the property within 5 days. The regulation also specifies that no disruptive conduct may occur. And there are consequences written into the regulation if there is disruptive conduct. Specifically, if the organizers engage in bad conduct and the growers want to file an unfair labor practice charge, as was stated in the complaint that Cedar Point did, they can do so. They can also file a motion to deny access, so that if a disruptive union has, you know, occurred, they can seek to bar that union from coming back. So there are remedies in the regulation itself, which again goes to show that the regulation's purpose is very specific. It does not allow for any kind of activity that would interrupt the business operations of the grower. And so on this narrow legal issue that's presented, the growers have not shown that there's a categorical, per se, taking. They've waived any analysis under Penn Central. As for the grower's second argument, that the regulation affects a seizure of their property, there's little case law to support this theory. The growers rely exclusively on the Presley case. But Presley has a much different set of facts than in this case. And, you know, just to step back, if every regulation where there was a takings claim were to be analyzed under the Fourth Amendment analysis, then all takings cases could be swallowed by this approach. But the Presley case has completely different facts than this case. That's a case where, and as the Court stated it, a regular presence of an army of trespassers who would freely and regularly traverse the yard, litter, camp overnight, destroy the property. That's a pretty extreme set of circumstances in which the Presley property was treated as if it was a public trail. Here, as I just mentioned, there are very specific time, place and manner limitations that ensure that any presence on the property is not going to interfere with business operations. And, in fact, as was mentioned in the previous argument, there was no, you know, the only allegation that was made about disruptive behavior was linked to really the interference of or a violation of the regulation, not a party that was, not an organizer that was following the regulation. So determining whether there's a meaningful interference is a context-specific analysis. And the growers suggest that any access to their regular to the property is a meaningful interference. And were that the law, no access regulation, even one that is limited, would be permitted. That is obviously not the law. The growers also discuss the second prong of the analysis. If there is a seizure that's found, is that seizure unreasonable? But I think it's worth noting, again, that there is no seizure here, that the district court found that there was no meaningful interference. So we don't even reach this question of whether there are alternative channels of communication unless there's a seizure found. The Board clearly has a strong interest in this regulation. It's written into the regulation itself. It's written into the law that the regulation is implementing. And there are two points in particular that the regulation states explicitly. One, that property interests, while important, must accommodate the right of unions to access workers. And two, that alternative channels of communication that are found adequate in industrial settings may not be adequate in an agricultural setting. In the judicially noticed testimony that is in the supplemental excerpts of record and that was, that was judicially, that was, excuse me, judicially noticed by the district court, it's found in the supplemental excerpts of record here, is public testimony of hearings held by the Board in 2015. And that testimony confirms that the conditions that are present today, even though there have been technological advances, are really the same conditions that were present in the 70s. Specifically, and as the test under Lechmere, the workers remain isolated from the flow of information that is characteristic of modern society. These are workers that, as Fowler concedes in one of their declarations, 50 percent of the Fowler workers still don't have a cell phone. So 50 percent may have a cell phone. We don't know if it's a smartphone or not. But clearly, more than half of those workers do not have access to the Internet. So the notion that, you know, social media, Facebook, is going to be an adequate way of getting a hold of these workers is flawed. Even Cedar Point acknowledges that a good number of their workers don't have cell phones. So there is, you know, there is a specific purpose to this regulation to ensure that these transient, non-native English speakers who have less exposure to technology than the rest of the population can be reached. These are strong interests, and they outweigh the growers' possessory interests, primarily because the interests that they have alleged are not deficiencies in the regulation itself, as I mentioned before. Specifically, you know, Cedar Point focuses on this disruption that was caused by UFW in one incident in 2015. And they allege that that's a flaw in the regulation itself. But if the conduct was causing disruption, the regulation specifically prohibits the disruption. It prohibits activities like coming onto the property and then giving notice, coming onto the property while the workers are working. So, you know, Cedar Point, again, has remedies that it can pursue and did pursue in that case. They filed an unfair labor practice charge. I want to address one case to go back to the set of cases to go back to the takings analysis, because there were a few Federal Circuit cases that were addressed in briefing quite extensively by the growers. And those are the Hendler and Otay Mesa cases. And those cases, the growers suggest, are a lot like this case because there was access that was allowed, and the court at the Federal Circuit found that that access went over the line. But in Hendler and Otay Mesa, there were fixed immovable objects on the property that were inseparable, really, from the access that was granted to be able to fix those objects. So, for example, Hendler, that's a case where there were wells that were 100 feet deep. They were lined in plastic and steel. They were surrounded by gravel and concrete. And in Otay Mesa, there were underground sensors to detect any immigrants that were crossing the border. And so the maintenance workers that would come on to these properties to fix the wells or the sensors, that entrance, which apparently could occur at any time and in any number and could occur during business hours, that was a much different level of interference than we have here. Here, obviously, there is no fixed immovable object. And so there is a real distinction between those cases and this case. And in fact, the Federal Circuit itself recognized that there's a distinction in the Boise Cascade Corporation case in which the Federal Circuit essentially limited Hendler to its facts. It acknowledged that Hendler is a particularly special case because of the permanence of the object and the level of access that was taken in that case. If the Court has any questions, I'd be happy to address them. Roberts. I think not. Thank you. Thank you very much. We urge the Court to uphold the judgment dismissing the case. Thank you. Thank you. You've saved some time. Thank you, Your Honors. A few points on rebuttal. First, in our opening brief, we did allege that this was a right-of-way easement, and we cited the California Civil Code 801, subsection 4, and they didn't — I don't think they disputed that provision. So to the extent that they didn't dispute it, it was waived. Second, if I were the opposing counsel advising the Board on what to do, I would say, if it's true that temporally limited easements would evade the Court's physical takings doctrine, I would say, well, just give them — just give them five days out of the year in which the union organizers cannot take access. Give them Thanksgiving, Christmas, and a few other days. I think that rule would just allow the government to evade the physical takings doctrine and encourage what I would call Penn Central creep. Third, as I noted, there was a judicially noticed supplemental — judicially noticed memo submitted into the supplemental excerpts of record. And on page 23 of that, there was a concern because that — that memo was talking about a proposed plan for Board members to take access onto the grower's property. And what they said was, any message on page 23, they said, any message that the Board members would disseminate on the grower's property needs to be specifically tailored to avoid the view that this is just union organization in disguise. And if you want to — if you want to further that interest, surely it's not correct to allow union organizers themselves to — themselves to take access onto the grower's property. Further, the Presley case is in a lot of ways actually less burdensome on the grower's private property interest than this case, because in Presley, all the government did was publish a map incorrectly. And the Presley court actually noted that the property owners were free to call the police and inject the trespassers at any time. So talk about time, place, and manner restrictions. Third-party trespassers were not allowed on the Presley's land at any time, in any manner, at any place. And here, the union — the access regulation clearly allows union organizers to go onto private property for 120 days per year for three hours per day. With respect to the arguments about cell phones that I just heard, nobody had cell phones in Lechmere. I think that was a 1992 decision, and yet the Supreme Court found that under the NLRA, there were ample alternative channels of communication. And when you're talking about access regulations in general, of course, places of public accommodations are different, and the government going in to execute a government purpose is different under the common law. So it's simply not true that by striking down this particular access regulation, you would invalidate many others as well, because many others involve either places of public accommodation or the government going in to execute a warrant or to further some governmental interests. My next point is that the regulation — the regulation allows — it's true that Cedar Charge against the union members for the incident in 2015, but the regulation is what allows the union organizers to come onto the private property in the first place. And I don't think it's a case that a — that a failure to comply with statutory or regulatory provisions would excuse one from violating the Constitution. And my final point is that the ARA itself, as was noted in the briefing, was enacted to ensure stability and clarity in the field of property rights. And I think the way to do that is with the Bright Line rule in — articulated in the court's physical takings test — physical takings cases, that the Bright Line rule that the Bright Line rule is a more effective way to do that than an ad hoc, multifactor test of Penn Central. If there are no further questions, we respectfully ask this court to resolve them. I have only one housekeeping concern. As I recall, there is only one named member of the board who is still on the board. Am I right on that? We — I believe we sued four members on the board. It was Gould, I think Sherma, and some other members. There were four or five defendants. But is there any need to bring that up to date? That is, by dismissing certain parties, certain persons, or substituting others? What is the position of the State on that? Your Honors, I'd be happy to let the State talk about that. But I believe under the Federal rules, when you're suing someone in their official capacity, they're automatically substituted. You may want to change the case caption. Professor Gould, I think, has long since left the board, for example. Absolutely. Thank you, Your Honor. Okay. Thank both sides for their arguments. Cedar Point Nursery, Fowler Packing Company v. William B. Gould IV, submitted for decision. And we're now in adjournment. Now, I know we have some students here. We will go to conference. And when we're finished with conference, I think Judge Paez may have to leave. But certainly, Judge Levy and I will come back out and talk to you. But in the meantime, we've got some Lockbarks who are happy to talk to you.
judges: Leavy, W. Fletcher, Paez